**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

AUTOMOTIVE FINANCE CORPORATION,

           Plaintiff,

           v.

DZ MOTORS, LLC, et al.,

           Defendants.

Civil Action No. 16-7955 (MAS) (DEA)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

    This matter arises from a tort claim brought by Plaintiff Automotive Finance Corporation ("AFC") against Defendant Raritan Bay Federal Credit Union ("Raritan Bay") for conversion. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). The Court conducted a four-day bench trial from December 14, 2020 to December 17, 2020. The parties submitted post-trial proposed findings of fact and conclusions of law on February 11, 2021. (ECF Nos. 177, 178.) The Court has considered the evidence presented at trial and the parties' related arguments and sets forth herein its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a)(1).[1]

---

[1] To the extent that any Finding of Fact represents a Conclusion of Law, it is hereby adopted as a Conclusion of Law and vice versa. In evaluating the testimony of the witnesses appearing at trial, and after the Court had the opportunity to hear their testimony and to observe their demeanor, the Court undertook an individualized credibility assessment of each witness and assigned the appropriate weight to the testimony based on the Court's conclusions with respect to credibility. Such determinations are reflected in the Court's factual findings.

# I.     FINDINGS OF FACT

## A.     The Parties

AFC is an Indiana corporation. (J-1.)[2] AFC is in the business of, *inter alia*, providing floor plan financing to automotive dealers and rental companies. (J-1; Trial Tr. 15:11-13.) The term "floor plan financing" refers to a loan made to an automobile dealer to finance its inventory, which is then secured by liens on the dealer's inventory. (Trial Tr. 15:15-21.) In the event of a default by the borrower, the floor plan lender is entitled to take possession of the dealership inventory, sell the inventory, and use the proceeds to satisfy the balance of the defaulted loan. (J-1 § 8.1.)

Raritan Bay is a federal credit union serving Middlesex County, New Jersey. (Trial Tr. 224:25-225:12-13.) Raritan Bay makes consumer loans to individuals who become members of the credit union and live, work, worship, or attend school in Middlesex County. (Trial Tr. 225:8-22.) As a part of its lending operations, Raritan Bay maintains what it calls its "dealer lending program." (Trial Tr. 224:20-23.) Through that program, Raritan Bay maintains lending agreements with car dealers. (Trial Tr. 227:2-5.) Under those agreements, Raritan Bay accepts credit applications from customers referred by dealers for the purposes of generating loans. (Trial Tr. 224:21-25.) After a dealer submits a credit application from a customer, Raritan Bay reviews the application and decides whether to finance the customer's proposed purchase from the dealer. (Trial Tr. 227:2-7.)

---

[2] Citations to "J" exhibits refer to joint exhibits admitted into evidence at trial. (Trial Tr. 218:3.)

B.    **The Parties' Relationships with DZ Motors, LLC**

DZ Motors, LLC ("DZ Motors" or the "Dealership") is a Limited Liability Company of the state of New Jersey that was previously in the business of selling high-end used luxury motor vehicles.  Dmitriy Zholobov was the principal and owner of DZ Motors.  (Trial Tr. 512:5-7.)

DZ Motors obtained floor plan financing from AFC to finance its vehicle inventory.  (J-1.) On or about May 13, 2010, AFC as "Lender" and DZ Motors as "Borrower" entered into a Demand Promissory Note and Security Agreement (hereinafter, the "Note").  (J-1; Trial Tr. 17:15-21.)  The essential terms of the Note were that AFC would provide floor plan financing to DZ Motors for its retail car business.  Under the terms of the Note, AFC could "in its sole discretion, from time to time make an [a]dvance to or on behalf of [DZ Motors] to purchase and/or hold [p]urchase [m]oney [i]nventory for resale, and for other purposes as determined in [AFC's] sole discretion."  (J-1 § 2.1.)[3]  Once AFC made an advance to DZ Motors for a particular vehicle, under its "Title Release Program," AFC would require DZ Motors to provide it with the title for that vehicle.  (Trial Tr. 23:22-24:15.)  When DZ Motors sold a vehicle, the Note provided that the advance or loan balance attributable to that vehicle was to be repaid by DZ Motors to AFC within forty-eight hours.  (J-1 § 2.6.)  Once the advance was repaid, AFC would release the title so that DZ Motors could forward the title to the purchasing customer.  (Trial Tr. 49:1-8.)

Under the terms of the Note, "[a]ll vehicles located at [DZ Motors's] place of business constitute inventory for resale in the ordinary course of Dealer's business unless the vehicle is plainly marked otherwise."  (J-1 § 6.8.)  Additionally, under the Note, DZ Motors agreed that it "shall not attempt to or actually, sell, lease, transfer, mortgage, encumber, or otherwise dispose of

---

[3] An "advance" was a "discretionary loan(s) to [DZ Motors] or payment(s) on behalf of [DZ Motors] by AFC" pursuant to the terms of the Note.  (J-1 § 1.2.)

the [p]urchase [m]oney [i]nventory, any part thereof, or any interest therein" unless the inventory is sold "to bona fide buyers in the ordinary and regular course of Dealer's business." (J-1 §§ 4.0, 5.1.)  Importantly, each vehicle purchased with an advance served not only as collateral for an AFC loan advance associated with that particular vehicle, but it also served as collateral for all of the other loan advances made to DZ Motors under the Note. (J-1) This is a concept known as "cross-collateralization," which refers to the process of having one asset serve as collateral for multiple loan advances.  Section 3.0 of the Note grants AFC a lien and security interest in all of the Dealership's "[c]ollateral," and Section 1.5 of the Note defines "[c]ollateral," in pertinent part, as "all of Dealer's assets and properties wherever located including without limitation (a) all . . . [e]quipment of any kind now owned or hereafter acquired by Dealer, (b) all [v]ehicles, vehicle parts, and other inventory of any kind now owned or hereafter acquired by Dealer . . . ."  At all times relevant, AFC held a perfected security interest in all of DZ Motors's inventory, including after-acquired inventory, through a UCC Financing Statement filed with the New Jersey Division of Commercial Recording on May 14, 2010.  (Trial Tr. 134:21-136:1; P-1; P-4.)

With respect to Raritan Bay, beginning in 2010, DZ Motors and Raritan Bay maintained "a dealer lending agreement." (Trial Tr. 227:4-7; P-25.)  Under that agreement, DZ Motors would forward credit applications to Raritan Bay from customers interested in purchasing a vehicle from the dealership.  (Trial Tr. 227:6-10.)  Raritan Bay would then review the application and either approve or deny the application as submitted or otherwise make modifications to the financing terms requested by the potential customer.  (Trial Tr. 227:6-10.)  Sometime in 2013, however, Raritan Bay significantly decreased the number of loans it accepted from DZ Motors.  (Trial Tr. 395:5-7.) And by September 2014, Raritan Bay stopped accepting applications from DZ Motors's customers altogether.  (Trial Tr. 395:8-10.)  Evidence at trial established that Raritan Bay

terminated its relationship with DZ Motors because "[t]he quality of the applicants being sent to Raritan Bay were not acceptable." (Trial Tr. 395:10-16.)

> ### C.   The Vehicles at Issue in This Case

This litigation involves a dispute between AFC and Raritan Bay about the proceeds from the disposition of two motor vehicles that were, at one time or another, in DZ Motors's inventory: a 2015 Bentley, VIN SCBFS8ZA0FC049904 (the "Bentley") and a 2016 Mercedes Benz G63, VIN WDCYC7DF7GX250462 (the "Mercedes").

> #### 1.   The Bentley

>> ##### a.   AFC's Financing for the Bentley

DZ Motors purchased the Bentley from Miller Motor Cars in Connecticut with an advance issued by AFC pursuant to the floor plan on May 8, 2015 in the amount of $341,025. (Trial Tr. 33:1-4, 67:25-68:5, 508:17-21.) At trial, there was conflicting evidence as to whether DZ Motors purchased the Bentley as inventory for resale, or whether the dealership purchased the vehicle for the personal use of its owner and principal, Dmitriy Zholobov.

Lee Morant, the former general manager of DZ Motors, testified that Dmitriy Zholobov "bought [the Bentley] for himself." (Trial Tr. 508:11.) Specifically, Mr. Morant testified that Mr. Zholobov "was the owner of the dealership, and he purchased this vehicle, and it was his—it was his baby. He loved his vehicle, drove it every day." (Trial Tr. 508:14-16.) Similarly, Mr. Zholobov's former wife, Elena Zholobov, testified that the "Bentley was our—like our—like a family car." (Trial Tr. 345:10-16.) Nevertheless, there was contradictory testimony from Ms. Zholobov and Mr. Morant about how often Mr. Zholobov drove the car, with Ms. Zholobov testifying that her former husband "didn't drive, like, all the time, Bentley. It was, like, really random." (Trial Tr. 358:2-9, *see also id.* at 358:22-25 ("Very seldom he came home on Bentley, yes.").) Mr. Morant testified that the Bentley "always had E-ZPass" affixed to the windshield and

other "personal belongings" in the car "because that was [Mr. Zholobov's] vehicle." (Trial Tr. 511:21-25.)

Whatever Mr. Zholobov's subjective intentions, the Court finds that "no one at AFC had any idea that Dmitriy Zholobov was acquiring the Bentley vehicle for his personal and family use and intended to keep the car and not sell it[.]" (Trial Tr. 19:5-18, 70:5-10.) As Anthony Middleton, Senior Corporate Investigator for AFC, explained at trial, "that's not the purpose of an AFC floor plan." (Trial Tr. 70:9-10.) Similarly, Michael Buzzanca, AFC's New Jersey Branch Manager from 2010 to 2016, testified that "if [Dmitriy Zholobov] disclosed that he was going to use it for personal use, we probably wouldn't have approved the floor plan. We probably would have only approved it if it was put up for retail sale." (Trial Tr. 120:6-13, 184:11-15.) Mr. Buzzanca also testified, however, that it was his understanding that "at times," Mr. Zholobov "was using [the Bentley] as a demo," (Trial Tr. 131:12-20, 184:17-23), and that he had heard Mr. Zholobov refer to the vehicle as "his demo," (Trial Tr. 132:20). According to Mr. Buzzanca, AFC would permit a dealer driving a demo to take the car home for an extended period of time, usually thirty or sixty days, and use the vehicle in their personal capacity. (Trial Tr. 81:16-22 ("They'll show it to their friends, do whatever, especially the nicer units because that's who—a lot of them buy them you know. We're nice that way.").)

In any case, DZ Motors represented to AFC and the public that the Bentley was inventory held by DZ Motors for sale. For example, over a year after its supposed purchase for Mr. Zholobov's personal use, the Bentley was listed on DZ Motors's website as for sale. (Trial Tr. 47:15-20; J-66.) According to Mr. Morant, "if it is on the site, it's probably on the site for AFC purposes for whatever floor plan that might be; so that they can see that the car was actually for sale." (Trial Tr. 519:20-22, *see also id* at 518:12-20 ("The way Dmitriy had said it to me was, you

know, that Mike [Buzzanca] told him to put it on the website . . . . I guess to make sure his boss
will see that it's up for sale.").)

Evidence at trial concerning "curtailment" extension requests also indicate that the Bentley
was held as inventory for sale.  At trial Mr. Buzzanca explained curtailment extensions were

> something [AFC] use[d] in this business because the vehicles are[]
> depreciable.  It gives the dealer the option that instead of having to
> use all its working capital to pay the vehicle off on a set date, they
> can extend the loan, granted the vehicle is not sold and it gives them
> extra time to sell the vehicle.

(Trial Tr. 127:1-6.)  Under the terms of the Note, the "curtailment date" is "that certain date at the
end of the [p]eriod when all obligations concerning or relating to an item of [p]urchase [m]oney
[i]nventory become due and payable." (J-1 § 1.6.)  The Note permitted AFC "in its sole discretion"
to "permit an extension of the curtailment date," "relative to an item of [p]urchase [m]oney
[i]nventory for a period, upon the payment of [i]nterest, [f]loorplan [f]ee(s) and a minimum of
[f]ive [p]ercent (5%) of the outstanding [a]dvance relating to such item of [p]urchase [m]oney
[i]nventory." (J-1 § 2.7.)  AFC gave DZ Motors seven curtailment extensions with respect to the
Bentley.  (Trial Tr. 88:2-10, *see also* Trial Tr. 514:14-17 (with Mr. Morant testifying "I knew that
there w[ere] extensions, but I did not know it was seven.").)

In connection with the curtailment extensions, "AFC require[d] photos of a vehicle at the
time a curtailment extension request was made." (Trial Tr. 505:12-17.)  Testifying about AFC's
general curtailment extension policies, Mr. Middleton explained that "when there's an additional
curtailment requested, you request a photo to show that unit is still in the lot and available for
sale." (Trial Tr. 32:20-25.)   Mr. Buzzanca testified to his knowledge of AFC's curtailment
extension requests from DZ Motors for the Bentley.  According to Mr. Buzzanca, a September 9,
2015 photo of the Bentley was sent to AFC because "[Mr. Zholobov] did an extension of the

curtailment." (Trial Tr. 128:21-129:7; J-25.) Mr. Buzzanca testified that DZ Motors "would be required to send us a photo, or if they can do now Facetime verifications, then we could verify the car within seven days of him—of AFC accepting the curtailment." (Trial Tr. 129:4-7.) In his trial testimony, Mr. Buzzanca credibly explained that curtailment photos only required "a picture of the entire car and a picture of the VIN number," not a picture "of the rear of the car, the front of the car, and the odometer." (Trial Tr. 195:8-12.) Ultimately, AFC approved six other curtailment extensions for the Bentley, each confirmed by photographs: November 3, 2015 (J-26); December 28, 2015 (J-27); March 1, 2016 (J-28); May 2, 2016 (J-29); June 30, 2016 (J-30); and September 2, 2016 (J-31). (Trial Tr. 129:14-134:11.) In all but two of these photographs, the Bentley was located in the DZ Motors showroom alongside and comingled with other DZ Motors's inventory. (*See* J-31; *but see* Trial Tr. 534:16-23 (with Morant testifying that in the J-30 photograph, the Bentley was parked in front of "the garbage area for DZ Motors at the time").)

In addition to curtailment photos, AFC monitors dealerships through "lot audits" performed by an affiliate company, "AutoVin." (Trial Tr. 29:6-7.) AFC provides AutoVin with a list of inventory it expects to be on the lot for sale. AutoVin then visits the dealership and advises AFC of which vehicles it located at the dealership lot. (Trial Tr. 29:6-31:5.) AFC then works with the dealership to ascertain the status of any missing units. (Trial Tr. 30:8-11.) The normal lot audit process occurs every thirty to forty-five days. (Trial Tr. 32:17-19.) Based on Mr. Middleton's testimony, the Court finds that the lot audits confirmed that the Bentley was on the lot and available for sale "a majority of the time." (Trial Tr. 39:16-22.) According to Mr. Middleton, from the time DZ Motors purchased the Bentley in May 2015, lot auditors only failed to confirm the Bentley was on the lot for sale "once or twice." (Trial Tr. 33:1-4, 39:13-25; *see, e.g.*, Trial Tr. 112:1-12 (describing the May 30, 2015, September 20, 2016, and October 5, 2016 lot audits as instances

where the Bentley failed a lot audit).) Usually, AFC's New Jersey Branch "was able to later verify, via the photo, showing that it was back on the lot." (Trial Tr. 33:5-14.) As Mr. Middleton testified, however, it was the Bentley's September 20, 2016 lot audit failure that, in part, triggered a larger investigation by AFC into DZ Motors's compliance with the terms of the Note. (Trial Tr. 112:1-13; *see also* J-53.)

                b.      Raritan Bay's Financing of Elena Zholobov's Purchase of the Bentley from DZ Motors

On August 18, 2015, Raritan Bay issued Elena Zholobov, the then-wife of Dmitriy Zholobov, a loan in the amount of $270,000.00. (J-11.) The amount was paid to DZ Motors for the purchase of the 2015 Bentley with the vehicle serving as collateral. (*Id.*; Trial Tr. 596:4-9; *see also* J-13 (DZ Motors Sales Order for Elena Zholobov, Aug. 10, 2015); J-16 (Raritan Bay's funding check to DZ Motors for the Bentley).)

The loan application submitted to Raritan Bay reported that Ms. Zholobov worked as a manager at DZ Motors making $450,000 per year. Notwithstanding this loan application, Ms. Zholobov testified at trial that she did not recall signing a loan agreement to borrow $270,000.00 from Raritan Bay, nor did she remember purchasing the Bentley. (Trial Tr. 342:1-7.) She did recall, however, that the Bentley "was a family car," (Trial Tr. 345:10-16), although, alternatively, she also recalled that she never made any payments on the car because "[i]t's all, like Dmitriy's business[,]" (Trial Tr. 362:8-16). Ms. Zholobov denied ever working at DZ Motors, saying "I've never worked at DZ Motors. Never, ever." (Trial Tr. 343:16.) Regarding her income at the time of the loan application and her purported employment at DZ Motors, Ms. Zholobov testified that "I never work. Not seven years, not like a manager, not like a sales-[person]. I didn't work. I mean, I stay home with two kids, and I didn't work at all." (Trial Tr. 344:10-12.) In explaining the false information provided to Raritan Bay in the 2015 loan application, Ms. Zholobov

9

postulated: "I don't know. Maybe Dmitriy did it, like—and even signature [on the loan application], I didn't say—said I signed it. It looks and I told you, it looks like mine, but I don't remember if I signed it." (Trial Tr. 343:25-344:3, *see also* Trial Tr. 344:14-16 (with Ms. Zholobov explaining the inflated income on the Raritan Bay credit application by saying "[p]robably Dmitriy did. That's why I divorce").)

Based on these discrepancies, and as Raritan Bay employees admitted at trial, the Court finds that the loan application submitted to Raritan Bay for the Bentley was replete with fraud. (*See* Trial Tr. 586:18-19 (with Sean Noke, a Raritan Bay loan officer testifying that "realizing at this point that this was fraudulent, Ms. Zholobov was not an employee").) The Court also notes indicia in the record of Mr. Zholobov's involvement in this fraud. (*See, e.g.,* J-15 (with Dmitriy Zholobov as President of DZ Motors guaranteeing Raritan Bay either a first priority lien and title against the Bentley, or else full payment on Ms. Zholobov's loan).) Accordingly, based on this indicia of Mr. Zholobov's involvement, combined with Ms. Zholobov's testimony to this effect, the Court finds that Raritan Bay's security interest in the Bentley was fraudulently created by Mr. Zholobov.

Notwithstanding Raritan Bay's payment to DZ Motors for the purported August 2015 transaction, DZ Motors failed to forward payment to AFC within the time frames required by the Note. Rather, as discussed above, DZ Motors continued to hold the Bentley for sale to the public on its website well after this transaction. Furthermore, credible testimony at trial established that even after the August 2015 transaction, DZ Motors sought seven curtailment extensions. (Trial Tr. 129:18-134:10.) As discussed above, DZ Motors took seven photos and provided them to AFC in connection with its curtailment extension requests. (Trial Tr. 33:19-25, 129:18-134:10.) AFC understood the photos taken in the showroom to be "proof[]" that the vehicle is still in the showroom

for sale." (Trial Tr. 34:18-20.) Additionally, because the Note provided that "[a]ll vehicles located at [DZ Motors's] place of business constitute inventory for resale in the ordinary course of Dealer's business unless the vehicle is plainly marked otherwise," (J-1 § 6.8), through these photos, DZ Motors represented to AFC that the Bentley was still for sale. Finally, as to the sole post-August 2015 curtailment extension photos not taken on DZ Motors's property (J-31), AFC still believed, notwithstanding the vehicle's location, that it was storing DZ Motors's title to the Bentley under the Title Release Program, (Trial Tr. 165:10-11). Because Mr. Zholobov had represented to AFC that he had used the Bentley as a "demo" in the past, (Trial Tr. 131:12-20, 132:20, 184:17-21), and because DZ Motors never informed AFC of the August 2015 transaction, DZ Motors effectively represented to AFC in the September 2016 curtailment photo that the Bentley was still inventory held for sale.

Unbeknownst to AFC, however, on the same day Raritan Bay issued the loan to Ms. Zholobov, State Farm issued an insurance policy for the Bentley with Elena Zholobov as the policy owner. (J-12.) Shortly after the purported sale to Ms. Zholobov, New Jersey's Motor Vehicle Commission issued a title in the name of Ms. Zholobov with Raritan Bay as the only noted lienholder. (Trial Tr. 597:9-25; J-19.) Nevertheless, the evidence before the Court suggests that the Bentley registration was not "filed" in Ms. Zholobov's name until May 28, 2016, after DZ Motors had already received four curtailment extensions following the August 2015 sale. (J-21.) Relatedly, while the Court credits testimony from Mr. Morant at trial that the Bentley's "dealer plates" had been replaced with "personal plates," (Trial Tr. 515:24-516:5), nothing in the record suggests that personal plates were put on the Bentley before May 28, 2016, (see J-21). Notwithstanding the legal documents in her name, Ms. Zholobov did not consider the vehicle her personal car, and it appears that DZ Motors made most, if not all, loan payments to Raritan Bay.

(Trial Tr. 362:10-14 (with Ms. Zholobov testifying that Mr. Zholobov made the payments on the

Bentley "because it's actually his car" and "[i]t's all, like, Dmitriy's business"), *see also* Trial Tr.

334:19-335:5 (noting payments on the Bentley from DZ Motors).)

               c.     Closure of DZ Motors and Sale of the Bentley to Morris County
                     Auto Sales

The Zholobovs finalized their divorce on April 25, 2016. (Trial Tr. 473:4-7; D-3.) When

they divorced, Ms. Zholobov asked Mr. Zholobov to sell the Bentley because it was "expensive"

and she "knew it was in [her] name." (Trial Tr. 355:3-11.) In her understanding, however, the

Bentley was "in [her] name" in the sense that it was insured under her name. (*Id.*)

By September 4, 2016, as a result of its audits of DZ Motors, AFC was concerned that

some of DZ Motors's inventory, including the Bentley, might have been "sold out of trust." (Trial

Tr. 40:5-42:1.) "Sold out of trust" in floor plan lending parlance means that a dealership received

an advance to purchase a particular vehicle as inventory and then sold the vehicle to a third-party.

But rather than taking the proceeds of that sale and paying off the advance associated with the

recently sold vehicle within forty-eight hours as required by the floor plan lending note, the dealer

instead "did something else with it," such as pay off another vehicle. (Trial Tr. 526:13-21.) As

DZ Motors's former general manager Mr. Morant explained, selling cars out of trust and

concealing this fact from the floor plan lender is analogous to "trying to juggl[e] a whole bunch of

balls at the same time." (Trial Tr. 525:23-25.) And as Mr. Middleton explained, "sold out of trust"

may suggest "that the dealer is robbing Peter to pay Paul." (J-53.)

Related to AFC's concern that DZ Motors's inventory had been sold out of trust, AFC's

investigation into DZ Motors suggested that the New Jersey Department of Motor Vehicles had

issued duplicate titles for some vehicles that were supposed to be in DZ Motors's inventory. (Trial

Tr. 41:2-42:1.) With respect to the Bentley, sometime in September 2016, AFC became concerned

12

that it was not holding "the newest title" through its Title Release Program but rather "had a prior title" and that the newest title had another lender's liens attached. (Trial Tr. 41:22-42:1.)

On October 5, 2016, Mr. Buzzanca personally appeared with AutoVin representatives for an unannounced lot audit at DZ Motors. (Trial Tr. 113:24-114:2, 171:4-11.) By that time, as Mr. Morant explained, the "juggling . . . was getting tough." (Trial Tr. 526:11-12.) The audit revealed that a number of cars that were supposed to be in DZ Motors's inventory were missing, and to the extent those cars had been previously sold, DZ Motors lacked the cash on hand to pay AFC for the associated advances. (Trial Tr. 142:18-145:25, 527:5-528:5.) Shortly thereafter, with Dmitriy Zholobov's agreement, AFC moved to repossess the vehicles financed under the Note that remained in DZ Motors's inventory. (Trial Tr. 146:2-3.)

In the course of repossessing DZ Motors's inventory, AFC officials, including Mr. Buzzanca, discussed with Mr. Zholobov and Mr. Morant the status of the Bentley. (Trial Tr. 196:23-199:11, 527:17-531:8, 540:20-541:4.) AFC's stock number for the Bentley was #2271. (Trial Tr. 68:6.) Trial testimony and AFC's contemporaneous records demonstrate that by October 7, 2016, the lender believed that "st #2271" was at Mr. Zholobov's residence. (J-51 at p. 16.) Furthermore, AFC's records demonstrate that Mr. Zholobov "was allowed a [deadline] of [October 10, 2016] to turn over unit and keys to AFC." (J-51 at p. 16; Trial Tr. 153:17-154:1.)

Notwithstanding the Elena Zholobov transaction, Mr. Morant testified at trial that he attempted to pay the Bentley off on behalf of Mr. Zholobov and thereby secure its title from AFC. (Trial Tr. 528:24.) According to Mr. Buzzanca, however, it was Mr. Zholobov himself who "presented us with the check that he asked us to put toward the Bentley." (Trial Tr. 197:11-12.) Nevertheless, the Court credits testimony from Mr. Buzzanca that while AFC was willing to accept checks that might compensate it for certain vehicles DZ Motors sold out of trust, AFC did not

agree to release its claims against the Bentley in exchange for any of those checks. (Trial Tr. 197:14-16 (with Mr. Buzzanca testifying "we totally would place that money into our—we would put that on his debt, but we were not putting it to pay off the Bentley").) Still, AFC accepted and deposited a check from DZ Motors for $60,602.62 as the amount associated with the remaining balance on the Bentley's advance. (J-22.) The check was dated October 11, 2016 and listed AFC's stock number for the Bentley, "STK# 2271." (J-22; Tr. 58:2-8, 532:2-12.) While accepting that check, however, AFC informed DZ Motors that it still intended to repossess the Bentley because the Dealership still owed it over two million dollars. (Trial Tr. 43:15-44:6, 197: 21-25.)

Nevertheless, after he received this check, Buzzanca gave either Mr. Zholobov or Mr. Morant the title to the Bentley that AFC had stored since 2015 when it originally financed the Bentley's purchase from Miller Motor Cars. (Trial Tr. 198:24-199:11.) As Mr. Buzzanca explained, in AFC's view, the title "was worthless because it had been duplicated." (Trial Tr. 199:7-9.) Still, even after surrendering this title and accepting the payoff check, AFC remained interested in securing the Bentley to satisfy DZ Motors's debts. (Trial Tr. 540:20-24 (with Mr. Morant testifying that Mr. Buzzanca "kept asking me, even . . . after he was paid for the Bentley, he kept asking me, where is this Bentley, where is the Bentley. He kept asking me where is the Bentley[?] And I said, Mike, I don't know. You'd have to ask Dmitriy").)

Ultimately, DZ Motors sold the 2015 Bentley to Morris County Auto Sales, Inc. for the sum of $180,000.00 in December of 2016. (Trial Tr. 427:25-428:10-13; J-67.) Prior to the sale, counsel for AFC had notified Raritan Bay of its claim to the Bentley via at least one letter and a telephone conversation with Mr. Noke. (Trial Tr. 410:24-411:11; P-17, Ex. C.) Notwithstanding that conversation, Mr. Noke was present for the December 2016 Bentley transaction. (Trial Tr. 426:20-25.) The check from Morris County Auto Sales was payable to DZ Motors, not Ms.

14

Zholobov. (J-67.) Once Mr. Zholobov received the check, he provided the check to Mr. Noke, who then left the parking lot where the deal had been finalized. (Trial Tr. 431:4-7.) Mr. Noke testified that before he left the parking lot, he "stamped the title and released it to Dmitriy." (Trial Tr. 431:6-7.) Mr. Noke testified that "the title that we released and I sent over was the one in Elena Zholobov's name with Raritan Bay as lienholder that I stamped the lien." (Trial Tr. 432:4-6; *see also* J-20.) Nevertheless, the title provided by DZ Motors to Morris County Auto Sales lists DZ Motors as the vehicle owner. (*See* J-67.)

### 2.   The Mercedes

The Mercedes was purchased by DZ Motors on June 29, 2016 with a floor plan advance from AFC for $147,275. (Trial Tr. 46:15-23, 50:10-15, 61:23-62:1.) On July 14, 2016, Mr. Zholobov and DZ Motors executed a purchase order for the Mercedes. (J-34.) On July 19, 2016, Raritan Bay issued Mr. Zholobov a loan in the amount of $149,000 for the purchase of the Mercedes. (J-32, J-37.) It is unclear from the record exactly when, but the Mercedes was registered in DZ Motors's name, and personal plates were issued for the vehicle. (J-41.) Notwithstanding this purported sale, however, the 2016 Mercedes appeared on the DZ Motors website for sale in a screen capture taken by AFC's counsel in November of 2020, after the dealership closed. (J-66.) Additionally, according to Mr. Middleton's testimony, the 2016 Mercedes's presence on the lot was verified multiple times by lot audits after July 19, 2016. (Trial Tr. 51 12-19; J-68.)

It was not until the time of the October 5, 2016 audit, once AFC was already concerned that vehicles had been sold out of trust, and shortly before AFC moved to repossess its inventory, that DZ Motors forwarded AFC a check for $141,259.98 to pay off the advance associated with the Mercedes. (J-42; Trial Tr. 62:2-9, 171:1-172:4.) Around this time, AFC also released the

Mercedes's title to DZ Motors. (Trial Tr. 170:15-171:11.) Raritan Bay's lien was recorded on an October 5, 2016 title that listed DZ Motors as the Mercedes's owner. (J-40.)

The Mercedes was ultimately insured under a Progressive commercial auto insurance policy beginning on January 12, 2017. (J-47.) The Mercedes was subsequently totaled in a car accident on March 10, 2017. (J-46; Trial Tr. 468:10-470:1.) Raritan Bay was listed as the loss payee under that policy. (J-47.) On May 15, 2017, Progressive paid Raritan Bay $132,299.49 because of its status as the loss payee under the policy. (J-35; J-46, J-47.)

## II.   CONCLUSIONS OF LAW

### A.   Choice of Law

As a preliminary matter, the Court notes that both parties appear to assume that AFC's claims are governed by New Jersey law. (AFC's Proposed Findings of Fact and Conclusions of Law *29 n.3,[4] ECF No. 177; *see generally* Raritan Bay's Findings of Fact and Conclusions of Law, ECF No. 178.) "A federal court sitting in diversity must apply the choice of law rules of the forum state[.] Thus, New Jersey choice of law principles govern the choice of law in this case." *Dynalectric Co. v. Westinghouse Elec. Corp.*, 803 F. Supp. 985, 988 (D.N.J. 1992) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1940)). As AFC rightly observes, under New Jersey's adopted version of the Uniform Commercial Code ("UCC"), "[w]hile collateral is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or non-perfection, and the priority of a possessory security interest in that collateral." N.J. Stat. Ann. § 12A:9-301(2). Because the disputed collateral in this case was located in New Jersey during almost all times relevant to this matter, the Court will apply New Jersey law to AFC's conversion claim.

___

[4] Page numbers preceded by an asterisk refer to the page number of the ECF header.

### B.    The 2015 Bentley

#### 1.    The Bentley as Inventory

At trial, AFC and Raritan Bay each sought to demonstrate that its secured claim to the Bentley entitled it to the vehicle's sales proceeds. The validity and priority of each party's secured claim hinges on whether and when the vehicle qualified as inventory.

Under Section 311 of New Jersey's adopted version of the UCC, "[a] security interest in a vehicle is perfected by compliance with the motor vehicle certificate of ownership law, which requires a notation of the interest on the vehicle's title." *Brenner Fin., Inc. v. Cinemacar Leasing*, 2012 WL 1448048, at *5 (N.J. App. Div. Super. Ct. Apr. 27, 2012) (citing N.J. Stat. Ann. § 12A:9-311(a)(2)). Nonetheless, an exception under Section 311 also provides that "during any period in which collateral subject to [the motor vehicle certificate of ownership law] is inventory held for sale or lease by a person . . . and that person is in the business of selling goods of that kind, this section does not apply to a security interest in that collateral created by that person." N.J. Stat. Ann. § 12A:9-311(d). As a comment to Section 311 explains,

> [u]nder subsection (d), perfection of a security interest in the inventory of a person in the business of selling goods of that kind is governed by the normal perfection rules, even if the inventory is subject to a certificate-of-title statute. Compliance with a certificate-of-title statute is both unnecessary and ineffective to perfect a security interest in inventory to which this subsection applies. Thus, a secured party who finances an automobile dealer that is in the business of selling and leasing its inventory of automobiles can perfect a security interest in all the automobiles by filing a financing statement but not by compliance with a certificate-of-title statute.

N.J. Stat. Ann. § 12A:9-311(d) (comment 4). The comment further explains that a financing statement only preserves a security interest in a debtor's inventory "'during any period in which the collateral is inventory held for sale . . . .' If the debtor takes goods of this kind out of inventory

17

and uses them, say, as equipment, a financing statement would not remain effective to perfect a security interest." *Id.*[5]

New Jersey law defines "inventory" as "goods, other than farm products which . . . are held by a person for sale or lease." N.J. Stat. Ann. § 12A:9-102(a)(48)(B). "Equipment" is defined as "goods other than inventory, farm products, or consumer goods." N.J. Stat. Ann. § 12A:9-102(a)(33). "Consumer goods," in turn, are defined as "goods that are used or bought for use primarily for personal, family or household purposes." N.J. Stat. Ann. § 12A:9-102(a)(23). As a comment to Section 102 explains, "[t]he classes of goods are mutually exclusive. For example, the same property cannot simultaneously be both equipment and inventory." N.J. Stat. Ann. § 12A:9-102 (comment 4a). "In borderline cases . . . the principal use to which the property is put is determinative." *Id.*

"In classifying goods as either equipment or inventory, the test is the *owner's* use of the goods." *In re Babaeian Transp.*, 206 B.R. at 546. "The parties' characterization of a transaction is not dispositive." *In re Carcorp, Inc.*, 272 B.R. 365, 375 (Bankr. S.D. Fla. 2002) (citing *In re Rex Grp. Inc.*, 80 B.R. 774, 781 (Bankr. E.D. Va. 1987) ("[i]t has been held that statements in a security agreement are not conclusive evidence of the owner's intended use of collateral") (citation omitted)). Because the "security agreement, however, is the embodiment of the parties' intentions

---

[5] States across the country have adopted similar provisions governing the perfection of security interests in vehicles. *See, e.g., In re Babaeian Transp. Co.*, 206 B.R. 536, 542 (Bankr. C.D. Cal. 1997) (explaining that in California "[i]f the vehicle is inventory, perfection may only be accomplished by filing a UCC–1 financing statement in the office of the Secretary of State. In all other cases, a security interest may be perfected only by obtaining a certificate of ownership for the vehicle showing the secured party as the legal owner"); *Blue Ridge Bank & Trust Co. v. Hart*, 152 S.W.3d 420, 426-27 (Mo. Ct. App. 2005) (explaining that in Missouri, "for security interests in goods covered by a certificate of title that are inventory held for sale by the maker of the security interest, there is an exception to the rule that a security interest once perfected remains perfected despite a change in use or transfer of possession").

. . . any reliance on the security agreement is not misplaced." *Id.* "Evidence contained in the security agreement should, at the very least, be given persuasive effect." *Id.*

First, Raritan Bay argues that because "[t]he Bentley was not inventory from the outset," AFC's financing statement was incapable of perfecting a security interest in the vehicle pursuant to Section 311(a) and (d). (Raritan Bay's Proposed Findings of Fact and Conclusions of Law 20.) In support of this argument, Raritan Bay cites Mr. Morant's testimony that Mr. Zholobov never intended to offer the vehicle for sale because it "was purchased as Mr. Zholobov's personal vehicle." (*Id.*)

The Court does not, however, credit Mr. Morant's testimony that Dmitriy Zholobov, "bought [the Bentley] for himself" from Miller Motor Cars in 2015 in order to use the car as his personal vehicle. (Trial Tr. 508:11, 515:7-20.) Despite this assertion at trial, Mr. Morant did not credibly testify to Mr. Zholobov's personal use of the car. For example, Mr. Morant testified that Mr. Zholobov's personal use of the car was evinced by the fact that he "drove it everyday." (Trial Tr. 508:14-16.) But Ms. Zholobov's testimony contradicted Mr. Morant's testimony on this point. (Trial Tr. 358:2-9 (testifying that Mr. Zholobov "didn't drive, like, all the time, Bentley. It was, like, really random").)

Second, Raritan Bay argues that the Bentley's seven curtailment extensions are evidence that the vehicle was not inventory held for sale. But the curtailment extension requests demonstrate the exact opposite. When submitting each of the seven curtailment extension requests, AFC required DZ Motors to provide photographic proof that the Bentley was still available for sale. In six of the seven curtailment photos, the Bentley was photographed on DZ Motors's property. Once again, under the terms of the Note, "[a]ll vehicles located at [DZ Motors's] place of business constitute inventory for resale in the ordinary course of Dealer's business unless the vehicle is

19

plainly marked otherwise." (J-1 § 6.8.) Accordingly, the Court finds that the curtailment photos are persuasive, if not dispositive, evidence that DZ Motors consistently used the Bentley as inventory. *See In re Carcorp.*, 272 B.R. at 373-74 (finding that vehicles were classifiable as inventory based in part on a security agreement's terms); *In re Rex Grp., Inc.*, 80 B.R. at 782 (finding that horses were not inventory held for sale but rather equipment based in part on a security agreement's terms).

Third, Raritan Bay argues that because the Bentley "had personal plates on it[,] which is consistent with the vehicle's registration[,]" this weighs against considering the Bentley as inventory. The Court agrees that the fact that the Bentley had personal plates on it weighs in favor of a finding that it was no longer being held as inventory. *Cf. Blue Ridge Bank*, 152 S.W.3d at 430 (finding that because a dealer drove a car "with used-car-dealer tags" and then negotiated a trade of that car, evidence at trial was "sufficient to support [a] finding that the vehicle was inventory when it was held for sale"). The Court notes, however, that a car can still be held out to the public for sale, even with personal plates. The Bentley's December 2016 sale to Morris County Auto Sales demonstrates this. (*See* J-21.) Similarly, the Court does not give much weight to Raritan Bay's argument that the failure to place sales pricing and buyer's guides in the Bentley's windows suggests that the vehicle was not in inventory at the time of the curtailment photos. Such stickers and warranties are neither necessary nor sufficient to meet the definition of "inventory" provided by Section 102. Moreover, trial testimony suggested that the penalty for failing to do so is only a five dollar fine. (Trial Tr. 506:15-507:1.) Nor does the presence of an E-ZPass in the Bentley remove the vehicle from DZ Motors's inventory. Rather, all of these factors must be weighed against other factors that might suggest that the Bentley was DZ Motors's inventory.

Considering all of the evidence, the Court finds that the Bentley was at all times relevant DZ Motors's inventory. Once again, the photos that accompanied the curtailment extension requests are persuasive evidence that the Bentley was for sale. Mr. Middleton's testimony that lot audits confirmed that the Bentley was consistently on the lot—making the vehicle inventory under the terms of the Note—supports this finding, as does the fact that the vehicle was consistently advertised for sale on DZ Motors's website. Furthermore, the Court credits Mr. Buzzanca's testimony that AFC likely would not have financed the Bentley under the floor plan agreement if it were not for sale. To the extent the Bentley was not on the lot or otherwise sporadically driven by Mr. Zholobov in his personal life, those facts are convincingly accounted for by trial testimony from Mr. Buzzanca that AFC permitted Mr. Zholobov to use the vehicle as a "demo." The Court credits Ms. Zholobov's testimony that the vehicle was driven "random[ly]." Notwithstanding such random personal use, "the principal use to which the property is put is determinative." N.J. Stat. Ann. § 12A:9-102 (comment 4a). Ms. Zholobov's testimony that the vehicle was driven randomly is supported by other evidence in the record suggesting that the vehicle was consistently kept on the lot and for sale.

Nor does the fraudulent transaction purportedly selling the vehicle to Ms. Zholobov suggest that the Bentley stopped being inventory. To the extent Ms. Zholobov owned the Bentley and her testimony can be understood as asserting that she financed the Bentley through Raritan Bay in order to buy her household a "family car," the Court does not credit that testimony. Ms. Zholobov repeatedly claimed that she could not recall basic facts about her involvement with the transaction. (*See, e.g.*, Trial Tr. 342:1-9 ("Q: So is it your testimony that this is your signature on [the Bentley loan agreement], or that you don't remember? A: I think it's mine, but I'm really—I don't remember. Like, looks like mine, but I do not remember.").) Ms. Zholobov also testified that she

never made any payments on the car because "[i]t's all, like Dmitriy's business." (Trial Tr. 362:13-14.) Because she failed to credibly testify to such basic details involving herself, the Court finds that Ms. Zholobov lacks credibility when discussing DZ Motors's intended uses for the Bentley or the purpose of the August 2015 transaction. Furthermore, the Court notes that other courts have declined to find that the purported removal of goods from a retailer's inventory via "sham sales" defeat a lender's secured claims against the goods as inventory. *See, e.g.*, *Homes Sav. Ass'n v. Gen. Elec. Credit Corp.*, 708 P.2d 280, 286 (Nev. 1985). Moreover, the fact that Morris County Auto Sales ultimately purchased the Bentley with a check payable to DZ Motors and received, in exchange, a title listing DZ Motors as owner rather than Elena Zholobov further supports the Court's finding that the vehicle remained in the Dealership's inventory.

Finally, even if the Bentley had been removed from the Dealership's inventory via the fraudulent sale to Ms. Zholobov or through some other change of use, the vehicle had once again become inventory "held for sale or lease by a person . . . in the business of selling" automobiles at the time of the December 2016 sale to Morris County Auto Sales. N.J. Stat. Ann. § 12A:9-311(d). The Zholobovs finalized their divorce on April 25, 2016. (Trial Tr. 473:4-7; D-3.) When they divorced, Ms. Zholobov testified that she asked Mr. Zholobov to sell the Bentley because it was "expensive" and she "knew it was in [her] name." (Trial Tr. 355:3-11.) Even assuming this account is true, it would demonstrate the car was inventory at the time of the December 2016 sale. Other courts construing the definition of "inventory" under similar statutory provisions have held that where a dealership owner sells his own used car from his used car lot, that sale "constituted a sale from inventory." *See, e.g.*, *Ex parte Gen. Motors Acceptance Corp.*, 425 So. 2d 464, 466 (Ala. 1983). In *Ex Parte General Motors Acceptance Corp.*, the Alabama Supreme Court held that by doing so, the car lot owner "found a new use for the goods when he sold his car from the

22

used car lot.  When the car was placed on the lot, it became inventory[.]"  *Id.*  The Court has already found that both before and after the Zholobovs finalized their divorce, curtailment photos confirmed that the Bentley was on DZ Motors's lot and available for sale.  (*See, e.g.*, J-25-J-30.) Even if there were times that the Bentley was not *on the lot*, such as during the sale to Morris County Auto, the Court would still consider the vehicle inventory held for sale by a person in the business of selling automobiles.  *Cf. Blue Ridge Bank*, 152 S.W.3d at 423, 430 (finding that a vehicle was "inventory" even where it had been driven by a merchant to another merchant's lot in order to negotiate a transaction).[6]

### 2.    AFC's Security Interest in the Bentley as Inventory Remained Perfected at All Times Relevant to This Litigation

As noted above, the Court has already held that it was Mr. Zholobov's fraudulent acts that created Raritan Bay's security interest in the Bentley.  As such, because the Bentley was inventory, Raritan Bay's fraudulently created security interest could only be perfected via a UCC filing.  *See* N.J. Stat. Ann. § 12A:9-311(d) (providing that "during any period in which collateral subject to [the motor vehicle certificate of ownership law] is inventory held for sale" by a person "and that person is in the business of selling goods of that kind, this section does not apply to a security interest in that collateral *created by that person*" (emphasis added)).  Relatedly, it is of no moment whether or not DZ Motors was still authorized to do business in New Jersey at the time of the Bentley's December 2016 sale.  In order for Mr. Zholobov to qualify as "a person in the business

---

[6] The parties have neither raised nor briefed the possibility that Ms. Zholobov consigned the Bentley to Mr. Zholobov and/or DZ Motors for sale within the meaning of New Jersey's UCC consignment provisions.  Accordingly, the Court will not analyze that possibility.  The Court notes, however, that other courts analyzing UCC consignment provisions in their jurisdictions have found "the fact that a consignor owns and holds legal title to a vehicle will not prevent qualifying secured creditors of its consignee from subjecting a vehicle to their claims if the consignor has not complied with UCC requirements concerning notice of the consignment."  *ITT Com. Fin. Corp. v. Unlimited Auto., Inc.*, 166 B.R. 637, 642 (Bankr. N.D. Ill. 1994).

of selling" automobiles, it is enough that in connection with the sale, Mr. Zholobov accepted a check payable to DZ Motors and presented the buyer with (1) DZ Motors's Business Registration Certificate; (2) DZ Motors's Certificate of Authority from the New Jersey Division of Taxation; and (3) a title for the Bentley listing DZ Motors as owner. (J-67); *accord with Blue Ridge Bank*, 152 S.W.3d at 428 ("Although Mr. Hart purported to be selling the vehicle as an agent of Poor Boys Auto, there was no evidence in the record that Poor Boys Auto was a viable entity, separate from Mr. Hart, that could legally hold title to the Cadillac."); *see also id.* at 430 (finding that a seller "represented himself as a car dealer, drove the Cadillac with used-car-dealer tags, and negotiated a trade of the Cadillac to acquire a vehicle desired by a customer of Mr. Hart. These facts are sufficient to support the trial court's finding that the vehicle was inventory when it was held for sale.").

As Raritan Bay acknowledges, under New Jersey law, "a secured party who finances an automobile dealer that is in the business of selling and leasing its inventory of automobiles can perfect a security interest in all the automobiles by filing a financing statement but not by compliance with a certificate-of-title statute." N.J. Stat. Ann. § 12A:9-311(d) (comment 4); *see also In re Babaeian*, 206 B.R. at 542 (finding under a similar provision of California's UCC that "[i]f the vehicle is inventory, perfection may only be accomplished by filing a UCC-1 financing statement"); *Blue Ridge Bank*, 152 S.W.3d at 430 (finding that under a nearly identical provision of Missouri's adopted version of the UCC, "[p]erfection under the certificate-of-title statute is not effective during any period of time in which the collateral is held as inventory"). It is undisputed that beginning in 2010, AFC had a duly filed financing statement asserting a claim over DZ Motors's inventory. (Trial Tr. 134:21-136:1; P-1; P-4.) On the contrary, however, it is also undisputed that, to the extent Raritan Bay perfected its interest in the Bentley at all, it did so

through the motor vehicle certificate of ownership law. (J-40; Tr. 601:2-15.) Because the Bentley was DZ Motors's inventory from the time of its purchase from Miller Motor Cars in May 2015 until its sale to Morris County Auto Sales in December 2016, AFC had a perfected security interest in the vehicle at all times relevant to this litigation, while Raritan Bay did not.

A security interest generally survives disposition of the collateral and continues in the collateral's proceeds. *JPMorgan Chase Bank, N.A. v. Jeffco Cinnaminson Corp*, 2012 WL 996617, at *5-6 (N.J. Super. Ct. App. Div. Mar. 27, 2012) ("Under [N.J. Stat. Ann. §] 12A:9-315(a)(1) and (2), a perfected security interest continues in collateral upon any disposition, unless an exception in the UCC applies."). "Proceeds" include "whatever is acquired upon the sale . . . or other disposition of collateral." N.J. Stat. Ann. § 12A:9-102(a)(64)(A).

Because the Bentley was inventory, AFC had a right to the proceeds of the vehicle's sale, absent an exception like the buyer in the ordinary course doctrine. If Mr. Zholobov or Ms. Zholobov were buyers in the ordinary course, either could take free and clear of AFC's lien. N.J. Stat. Ann. § 12A:9-320(a) ("[A] buyer in ordinary course of business . . . takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence."); *Jeffco Cinnaminson Corp*, 2012 WL 996617, at *6 (noting that the effect of N.J. Stat. Ann. § 12A:9-320(a) is that a buyer in the ordinary course "acquires the goods with clear title"). In that situation, New Jersey's buyer in the ordinary course doctrine provides that AFC's security interest would be lost because it "le[ft] the goods with a dealer in those goods with the expectation that they will be sold by the dealer in the ordinary course of business." *Ocean Cnty. Nat'l Bank v. Palmer*, 457 A.2d 1225, 1228 (N.J. Super. Ct. App. Div. 1983). A lender that financed and then perfected a secured claim against the Zholobovs' ordinary course purchase might then defeat AFC's inventory lien. *See, e.g., Ex parte Gen. Motors Acceptance Corp.*, 425

So. 2d at 467 ("[w]hen [buyer in the ordinary course] purchased the car he took it free of [floor-plan lender's] security interest," and thus, the buyer's bank "receives the benefit of [buyer's] protection" under the ordinary course doctrine).

On this record, there can be no serious contention that the Zholobovs were in any sense buyers in the ordinary course. *Accord with Martin Marietta Corp. v. N.J. Nat'l Bank*, 612 F.2d 745, 751 (3d Cir. 1979) ("if the sale was a sham to avoid the seller's obligation to his creditor, then it probably would not satisfy . . . the buyer in the ordinary course requirement"); *Taylor Motor Rental, Inc. v. Assocs. Discount Corp.*, 173 A.2d 688, 690 (Pa. Super. Ct. 1961) (rejecting an assertion that plaintiff was a buyer in the ordinary course where the operator of the dealership acted for both the dealership and the purported buyer "in applying for the certificate of title in the name of the plaintiff. The purported sale by seller to the plaintiff [buyer] was merely a paper transaction for the benefit of [seller], who now has possession of the automobile for which defendant has never been paid."). Moreover, at trial, even Raritan Bay's employees acknowledged the fraud involved in the August 2015 transaction. (Trial Tr. 586:18-19.)

Furthermore, the parties have not asserted that some other exception to the general rule that a security interest generally survives disposition of the collateral. Nor does the Court find that any other exception applies in this case.

### 3.    Raritan Bay Converted the Proceeds of the Bentley's Sale

Because "a security interest generally survives disposition of the collateral, . . . the secured party is entitled to repossess the collateral from the transferee or, in certain instances may commence an action alleging conversion." *In re Jersey Tractor Trailer Training Inc.*, No. 07-5853, 2008 WL 2783342, at *14-15 (D.N.J. July 15, 2008) (citing N.J. Stat. Ann. § 12A:9-315 (comment 2)), *aff'd in part, vacated in part on other grounds*, 580 F.3d 147 (3d Cir. 2009). "The

elements of conversion are: (1) the property and right to immediate possession thereof belong to the plaintiff; and (2) the wrongful act of interference with that right by the defendant." *Kromah v. Kagan*, No. A-3499-17T4, 2019 WL 1283886, at *2 (N.J. Super. Ct. App. Div. Mar. 19, 2019) (citation and internal quotation marks omitted).

Here, the Court finds that Raritan Bay committed conversion when it took possession of the proceeds of the December 2016 Bentley sale. Raritan Bay was aware of AFC's secured claims to the Bentley and the proceeds of its sale. Consequently, it had no right to interfere with the proceeds of the Bentley's sale to Morris County Auto Sales.

### 4. Accord and Satisfaction

The Court does not agree with Raritan Bay's argument that AFC's acceptance of the October 11, 2016 check noting the Bentley's stock number constituted an accord and satisfaction extinguishing AFC's interest in the Bentley proceeds. The doctrine of accord and satisfaction "necessitates a finding that the party making the tender and the party accepting the tender each intends the acceptance to serve as full satisfaction *of the entire disputed obligation*." *Zeller v. Markson Rosenthal & Co.*, 691 A.2d 414, 466 (N.J. Super. Ct. App. Div. 1997) (emphasis added). "The elements of accord and satisfaction are: (a) a bona fide dispute as to the amount owed; (b) a clear manifestation of intent by the debtor to the creditor that payment is in satisfaction of the disputed amount, and (c) acceptance of satisfaction by the creditor." *TJD Architects v. Cervini's Auto Designs*, No. 08-4705, 2010 WL 694561, at *2 (N.J. Super. Ct. App. Div. Mar. 2, 2010).

It is true, as Raritan Bay argues, that New Jersey courts have held that where "a check bears a notation indicating that it is being tendered in full satisfaction of the disputed debt, [courts] impute to the creditor an intent to be bound by the amount of the check if the creditor deposits the check for collection, notwithstanding the deposit is made 'under protest.'" *Customers Bank v.*

*Reitnour Inv. Props., L.P.*, 181 A.3d 1038, 1048 (N.J. Super Ct. App. Div. 2018).  Nevertheless, *Customers Bank* is distinguishable from this case.  Similar to the matter now before the Court, *Customers Bank* involved cross-collateral security agreements.  There, the creditor provided the debtor with payoff information for particular loans and accepted the checks designating payment for specific loans. *Id.* at 1041-42.  A week later, however, the creditor advised the debtor that it would not use the funds to satisfy particular loans and would instead "apply the funds as it deemed necessary." *Id.* at 1043-44.  Here, the evidence at trial did not clearly establish that AFC provided DZ Motors with specific payoff amounts and the stock number associated with the Bentley.  (Trial Tr. 536:11-537:23, 538:19-20; *but see* Trial Tr. 202:14-24 (with Mr. Buzzanca testifying that payoff information for the Bentley may have been available from AFC's website); *see also* J-60 (with an AFC employee instructing colleagues to "[p]lease disable any online access" for DZ Motors at 4:52 p.m. on October 11, 2016).)  Furthermore, in the case at bar, unlike the creditor in *Customer Bank*, trial testimony establishes that AFC immediately informed DZ Motors that it objected to the Dealership's characterization of the scope of tender.  (Trial Tr. 197:14-16, 537:2-538:11.)

AFC's decision to deposit a check clearly designating the Bentley's stock number as the target of DZ Motors's tender, combined with AFC's contemporaneous objection to the designation, created a dispute of material fact as to whether the lender intended to accept DZ Motors's characterization of the scope of tender.  New Jersey courts have held that where the parties dispute the scope of tender, "[a] trial is needed to resolve the factual disputes." *See, e.g.*, *TJD Architects*, 2010 WL 694561, at *2 ("The notation on Cervini's check stated that the sum submitted was for a release of all claims .... By crossing out the words 'release of all claims' and

writing the notation 'no,' . . . TJD expressed its view that the check . . . did not constitute a 'release of all claims.'").

After carefully considering the evidence at trial, the Court finds that while the first element of the accord and satisfaction doctrine is clearly satisfied, the trial record does not establish the second and third elements. By October 11, 2016, AFC and DZ Motors understood that the Dealership's debt obligation amounted to approximately $2.3 million. (Trial Tr. 43:15-44:6, 536:11-538:1.) In the same conversation in which it discussed acceptance of the $60,602.62 check, AFC was attempting to locate and repossess DZ Motors's other cars in an effort to satisfy the Dealership's entire debt. (Trial Tr. 531:1-6 (with Mr. Morant testifying that AFC officials entered his office and "we were going over a few things, certain cars they had questions, asking me where this one was at, where that one was at. And then I told them that—you know, we went over certain cars. I did hand Mike and Kyle the check for the Bentley.").) Plainly, then, DZ Motors did not offer the check in satisfaction of the entire $2.3 million disputed obligation between it and AFC. Accordingly, the check for the Bentley was only a manifestation of intent by the debtor to the creditor that payment is in satisfaction *of some of the amount* of the disputed $2.3 million obligation. As such, the second element of the accord and satisfaction doctrine is not met. And while there is significant ambiguity in the record about both whether and why AFC provided the Dealership such specific payoff information, the Court cannot find on this record that there was a "meeting of the minds between the parties to resolve the disputed claim for the amount submitted." *Cf. TJD Architects*, 2010 WL 694561, at *2 ("It can hardly be said in this case that TJD intended to accept Cervini's check as final payment for all services rendered on this project. Thus, there was no meeting of the minds between the parties to resolve the disputed claim for the amount submitted.").

### 5.   Unjust Enrichment

The Court also rejects Raritan Bay's argument that the doctrine of unjust enrichment bars AFC's claims to the sale proceeds of the Bentley because the advance associated with the Bentley has already been paid in full.  Raritan Bay cites no legal authority for the proposition that a debtor can attempt to pay off an advance associated with a particular item of inventory, even while the creditor is attempting to repossess the inventory and the item remains in inventory, and, under these circumstances, the debtor can find safe harbor under the doctrine of unjust enrichment. (Raritan Bay's Proposed Findings of Fact and Conclusions of Law 30-31.)  The Court simply does not agree that a properly perfected cross-collateral security interest in a piece of inventory can be extinguished by the doctrine of unjust enrichment under these circumstances.  Furthermore, the Court notes that the Third Circuit has suggested that in attempting to collect the full amount owed under a cross-collateral security agreement "it is clear that the creditor . . . is limited only to the amount of its *debt*, not the value of the underlying property." *In re Tower Air, Inc.*, 397 F.3d 191, 201 (3d Cir. 2005).

### 6.   AFC Did Not Authorize the Bentley's Sale to Ms. Zholobov

Finally, the Court rejects the argument that AFC retroactively "authorized" the August 2015 sale of the Bentley to Ms. Zholobov when it released the vehicle's title in October 2016. (Raritan Bay's Proposed Findings of Fact and Conclusions of Law 29-31.)  Under the plain terms of the Note, DZ Motors agreed that it "shall not attempt to or actually, sell, lease, transfer, mortgage, encumber, or otherwise dispose of the [p]urchase [m]oney [i]nventory, any part thereof, or any interest therein" unless the inventory is sold "to bona fide buyers in the ordinary and regular course of Dealer's business." (J-1 §§ 4.0, 5.1.)  None of the evidence presented at trial suggested

that AFC ever intended to waive this provision and authorize a non-ordinary course sale to Ms. Zholobov.

### C.    The Mercedes

The Court reaches a different result with regard to Progressive's May 15, 2017 collision insurance payment to Raritan Bay for the 2016 Mercedes's total loss.  (J-46.)[7]

DZ Motors was the "named insured" on the operative policy whose coverage began on January 12, 2017.  (J-47.)  "The named insured is the party that pays the premium for the property or liability policy."  *In re Amiel Rest. Partners, LLC*, 510 B.R. 744, 749 (Bankr. D.N.J. 2014) (citation and internal quotation marks omitted).  "In order to recover proceeds on an insurance policy, the insured must have an insurable interest in the realty, chattel or person covered by that insurance."  *Balentine v. N.J. Ins. Underwriting Ass'n*, 966 A.2d 1098, 1110 (N.J. Super. Ct. App. Div. 2009) (citation and internal quotation marks omitted).  "[T]he test of insurable interest is whether the insured has such a right, title or interest therein, or relation thereto, that he will be benefited by its preservation and continued existence *or* suffer a direct pecuniary loss from its destruction or injury by the peril insured against."  *Id.* (citation and internal quotation marks omitted).  "[I]t is fundamental that one may have an insurable interest in property without any necessity of being the absolute owner thereof."  *Id.*  "Specifically, even one who has no title, legal or equitable, in the property, . . . has an insurable interest therein, if he will derive benefit from its continuing to exist, or will suffer loss by its destruction."  *Id.* (citation and internal quotation marks omitted).  Here, it is undisputed that DZ Motors had an insurable interest in the Mercedes and lawfully insured the vehicle.  (*See* Raritan Bay's Proposed Findings of Fact *36 ("the 2016

---

[7] Following the close of AFC's case, Raritan Bay moved for a directed verdict on AFC's conversion claim as to the Mercedes.  (Trial Tr. 486:13-487:4.)  At trial, the Court reserved judgment on that motion.  (Trial Tr. 489:22-25.)

Mercedes was never transferred out of DZ Motors, LLC's name, remained insured by DZ Motors, LLC, and remained at all times available for sale to the public as part of DZ Motors's inventory").)

The Mercedes was totaled in a car accident on March 10, 2017.  (J-46; Trial Tr. 469:21-470:1.) Because of the total loss of the vehicle, on May 15, 2017, Progressive paid Raritan Bay $132,299.49 because of its status as the loss payee under the policy.  (J-35; J-46, J-47.)

Secured creditors are entitled to insurance payouts as proceeds "to the extent of the value of collateral and *to the extent payable to the debtor or the secured party.*"  N.J. Stat. Ann. § 12A:9-102(a)(64)(E) (emphasis added).  Raritan Bay, as "loss payee is not an insured but only a mere appointee of the insured[.]" *Liberty Mut. Fire Ins. Co. v. Kahlaid, Inc.*, 489 A.2d 1231, 1232 (N.J. Super. Ct. App. Div. 1985) (citation and internal quotation marks omitted).  Under New Jersey law, "[b]ecause of the personal nature of a contract of insurance, if an insurance policy is made expressly payable to a second mortgagee, the second mortgagee is entitled to the policy proceeds in preference to the holder of a first mortgage who is not listed as a loss payee under the policy." *Midland Lumber & Supply, Inc. v. J.P. Builders*, 626 A.2d 89, 91 (N.J. Super. Ct. 1993) (citing *City of Newark v. Cent. & Lafayette Realty Co.*, 374 A.2d 504, 507 (N.J. Super. Ct. App Div. 1977) ("A contract of fire insurance, being personal to the insured, does not, in the absence of contract stipulation, inure to the benefit of the holder of a lien on the property insured." (internal quotation and citations omitted))).  New Jersey's stance toward loss payees accords with other jurisdictions' treatment of competing claims on insurance proceeds. *See, e.g., In re Hardin*, 375 B.R. 506 (E.D. Wisc. 2007) ("Generally, a lienholder who is named as loss payee is entitled to the insurance proceeds, despite the claims of other lien or judgment creditors, by reason of its contractual right with the insurer. " (quoting 44A Am. Jur. 2d Ins. § 1704)); *Fuller v. Stonewall Cas. Co. of W. Va.*, 304 S.E.2d 347, 350 (W. Va. 1983) ("By reason of this contractual right, a

32

lienholder who is named as loss payee on an insurance policy is entitled to the insurance proceeds to the extent of the amount of his debt which is independent of the claim of other lien or judgment creditors.").

Because of its status as loss payee, Raritan Bay was entitled to the $132,299.49 Progressive insurance payment for the 2016 Mercedes's total loss.  Accordingly, with respect to that payment, AFC's conversion claim fails.

## III.   CONCLUSION

For the reasons set forth above, the Court will enter Judgment in favor of AFC.  The Court will enter an Order consistent with this Memorandum Opinion.

s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE
